The court will proceed to the third case, Jason Foods v. Unsecured Creditors Committee. Mr. Halsterak. Good morning. May it please the court, my name is Scott Halsterak. I'm representing the defendant in the adversary proceeding in the bankruptcy court below and the appellant in this case, Jason Foods. This case concerns the application of the subjective ordinary course of business defense to a preference case, and I think it's important first to understand the purpose and policy here. Before I do that, though, Jason's is asking the court to reverse the decisions of the lower courts, finding that some of the payments that Jason's got during the preference period in the Spar bankruptcy were not available to be protected by the subjective ordinary course of defense. This particular section that we're talking about, Section 547C2A of the Bankruptcy Code, has been around for a long time and recently in 2005 became a separate section, separating itself from the ordinary test. This particular section is designed to protect recurring customary credit transactions that are incurred in the ordinary course of business. The courts have repeatedly said that this policy of protecting certain payments that are ordinary between the parties does not offend the otherwise reason for the preference section, which is to discourage action in the period before the bankruptcy by the debtor and the creditor. So let me just make sure I have a handle on exactly what your argument is. Are you arguing that the bankruptcy court should not have applied the bucketing method to the preference period payments at all, or just that they applied the method incorrectly? Our argument is that the bankruptcy court should not have applied the bucketing method in this case, Your Honor. Bankruptcy court should have applied the full-range method. And the reason is? Two reasons, Your Honor. The full-range method, as I'll outline, really represents what the transactions were and the dealings were between Sparrow and Jasons. The bucketing method, which at the basis uses an average, distorts the transactions that were occurring in the pre-preference period. The bankruptcy code itself does not define ordinary course, and there's no precise test. The goal here is to be able to compare transactions occurring before the preference period with those that occurred in the preference period. So is it your position that any payment prior to the preference period, no matter how atypical, should be considered ordinary for purposes of meeting your burden here? No, because there certainly could be substantial deviations occurring before the period. What we've proposed or suggested in the argument is that even using Judge Weedoff's shortened deadline, if we used the full-range method, all of the payments would be covered. In this case, the only factor that was considered in creating the baseline was the aging of the invoices. And in this case, the aging, actually, if you compare the two periods, the pre-preference period and the preference period, show similarity and a compactness and overlapping and really no substantial deviations. That is easily seen, I think, on page 9 of our opening brief. There's a chart that shows all the pre-preference period invoices from February 2, 2010, through November 7, 2011. And with the exception of two payments, 47 and 49 days out, substantially all of the payments in that period, the range is from 8 days to 38 days, with, as the Court can see, obviously, big groups in the middle. The Bankruptcy Court did not use the full range to compare. They did two things. First, the Bankruptcy Court looked to April 15 of 2011 and saw that certain payments had grown later than they had before that period of time. Based on that and relying on Telona, this Court's decision, the bankruptcy judge decided to ignore, if you will, fully a third of the historical period. And the problem with doing that in this case is that many of the transactions that are ignored actually fit well within the pattern and the custom between Jasons. That's illustrated, again, more easily maybe on the committee's chart on page 10 and 11, where the committee has separated the new baseline, February 2 through April 15, and the other period that was excluded or is not being considered. And the Court will see that there are many invoices in the excluded period that match up perfectly with the invoices in this baseline. We don't believe Telona supports that methodology used by the Bankruptcy Court because Telona, of course, talking about the objective standard, suggests that you need to look back to when relations were normal, and that's been done here. The pre-preference period goes back almost 21 months from the preference period, so the room for error, if you will, has been satisfied. Telona, however, I submit does not stand for the proposition that you should ignore certain parts of the pre-preference period, as the Bankruptcy Court did in this case. It simply says you need to really go back and make sure you're looking at a period of time when relations were normal. The Circuit City case, which is cited by the committee to support this, is certainly distinguishable, in Circuit City there was what was referred to as a liquidity event, and the variations in the average ages of invoices, to use the Court's word, were stark. So we don't think that supports this. The second thing then the bankruptcy judge did was, using this shortened or truncated baseline from February 2, 2010 to April 15, 2011, the Bankruptcy Court then took an average, and the average that the Court came up with was 22 days, and to that the Bankruptcy Court added six days in both directions. So the new baseline became 16 to 28 days, which is an incredibly narrow range if you consider the whole baseline, which was 8 to 49, or even the shortened baseline, which was 8 to 38. By doing that, the Bankruptcy Court excludes 11 invoices totaling approximately $252,000. Where did the six-day add-on come from? No idea, Your Honor. There's nothing in the record to say why the judge picked six days. I mean, following the judge's approach, you don't quarrel with the weighted average calculation. No. I mean, you want a different method used entirely, but assuming that it wasn't error to use this method, you don't quarrel with the calculation of the weighted average. It's the six days on either end, which seems arbitrary. Your Honor is exactly right. The six days added to the average is what we're quibbling with, but the calculations, lots of this was stipulated to, and we used regular averages, but they didn't vary significantly from the weighted average. Right, and this method with the weighted average with the six days on either end only captured, as I understand it, about 64% of the historical period, the truncated historical period? That's correct, Your Honor, and as I was showing with the committee's chart, a large number of invoices were not counted, which would change averages and things like that. So if you take it up to 30 days, we get to something like 88%? Thirty days would get us up to about 88%, and that would pick up all but the two invoices that were 37 days and 38 days, which are covered by our new value defense. Even so, during the preference period, most of the payments beyond 30 days were paid at 31, as I understand it? Yes, and if you look again sort of at the groupings, the way these parties did business with the scattered days, I think 30 or 31 days is certainly something that would be considered normal. The aging issue, which we're quibbling with, was addressed by Judge Golgar in the GGCI bankruptcy case, and the trustee in that case wanted the bankruptcy court to use a 50-day average from the pre-preference period and use that to compare to the invoices in the preference period. Really, for the same reasons Judge Golgar said, that mechanical approach doesn't work where you have this scattered group of payments, because the assumption is that there's a regular payment routine around 50 days. As we can see here, using 22, yeah, it sort of fits in the middle, but it's misleading to use that average considering the way these parties did business. We suggest, of course, then, that using the full range is the appropriate way, because whether you look at the whole pre-preference period, the truncated or shortened preference period, all these covered payments pretty much, whether you use average aging, whether you use ranges, groupings, bucketing, visually, sort of the best way to see our argument is in these charts where they're grouped. If I could reserve then time for the rebuttal. Surely. Thank you, Justice Barrett. Thank you. Ms. Lightling. May it please the Court. My name is Pamela Lightling, and I'm appearing on behalf of the Unsecured Creditors Committee today. You can pull that down. Thank you, Your Honor. I hope you can hear me. My voice is a little scratchy today. Contrary to my opponent's argument, we do believe that the bankruptcy court did use the correct basis to determine the preference payments. Just because some of them were outside of the ordinary course of business and then subject adjacent to some individual liability, does not mean that the bankruptcy court committed any error. In fact, what Judge Weedoff did is that he first did a two-step approach. He looked at the stipulated facts. And from those facts, he made a decision. He took the facts and made a decision that there was a time period when the debtor was financially healthy and that that time period was the accurate baseline in order to determine and make a comparison for what the proper range was. In doing so, he found that after the April 15, 2011 date, that there was a significant increase in the change of the payment history between the parties. And if we're going to look at what is an ordinary course, we have to look at what is the course of dealing between the parties. And that was a change after April 15. It doesn't have to always be a fall into bankruptcy or a financial distress, but there's a change in how they conducted their business. And that was on our stipulated Exhibit No. 5 that was submitted. So he excluded those eight months. Even Jason admits that there was a change in payments after that April 15. Therefore, looking forward from February to the April 15, he used that as their baseline because that accurately showed what the parties' course of dealing was prior to the preference period. Using that, he then made the second-step analysis, which was looking at the average. He rejected the total range approach because in doing so, what happens is then the exception swallows the rule. If you take from 8 to 49, then everything becomes included. And then there's no purpose to having a preference. I mean, there's no purpose in having an exception then to be protected. Instead, he looked at the average lateness. So 22 days was determined. Judge Sykes, you asked where the six days come from. If we look at the averages that Jason proposed, they proposed averages that went from 22, 23, to 27 days. If we add six days to 22, we end up with 28 as the outer limit, and 16 as the lower limit. But where did the six come from? Why not eight? Well, I think if we went eight, Your Honor, and I can't second-guess what he did, he would have also included Jason's proposals. But I think he took a deviation. In Ray Hansen, they took a 10% deviation. Here, Judge Weedoff took a 26% deviation and actually gave him a window of opportunity or a window of ordinary course of business from 16 to 28 days that included a tremendous amount of payments that protected them in serving also the purpose of 547, which was to protect a creditor who did work with a debtor who was going into bankruptcy. In doing so, the fact that there may be 11 payments that are not protected individual fairness has to take a second seat to the second purpose of 547. And that purpose is that all creditors within the class are treated equally. Because there may have been one or two other payments, all they're trying to do is continuously decrease their potential liability. But we have to treat all the creditors equally. One cannot receive more than the other. And in this case, Jason, initially we had asked for over $500,000 of liability. And Judge Weedoff reduced that to a fining of $300,000 and then applied their new credit to reduce the liability down to $242,000. Right, but the point of the ordinary course of business defense to preference avoidance is really to provide a safe harbor. And so the methodology has to bear some strong connection to the actual course of conduct between the parties. And it seems to me there's plenty of support for using the historical period that the parties stipulated to. And by departing from that, the judge was forcing a different methodology on that the parties agreed was appropriate. Why not use the period of time from April 15th all the way to the preference period? What justification is there for throwing that out when the parties stipulated that that was the appropriate timeframe to measure the parties' historical practice? Well, we stipulated that that was the historical period. However, Your Honor, as the trier of fact, he can also decide how much weight to give to those facts that are submitted, just like you can give certain weight to the witness' testimony. I understand he can, but the question is why? And was there a reasonable basis to do that when the parties were in agreement that the right historical measure ran all the way up to the preference period, that there wasn't such a substantial departure post-April 15th as to justify throwing all that historical evidence out? I mean, it's basically an evidentiary question, right? Well, again, I can't second-guess what Judge Weadoff did. I can look at his decision, and given Tolano-Pizza, and he cites that, saying that he looked well before. Right, that's an over-reading of that case. What he found, though, is that there was some change. There is the proposition that we want a large enough historical period to be able to discern what is in the ordinary course and custom between the debtor and this creditor. It doesn't mean that you have to put the end of the historical period a long way away from the preference period, and that seems to be what Judge Weadoff was saying. Well, I think it's also a factual basis, Your Honor, because if you're looking at the subjective ordinary course of business, everybody's course of business between two businessmen are going to be different. And I'm not saying that this is a rigid rule that should be applied in future cases. I believe that based on these facts, if you're going to look at what they did, you have to look at what they consistently did. What they did after April 15th was not consistent with their payment history prior to that. Right, but the principle is you throw out outliers, right? Right, and that's what he did. Payments 14 days instead of 16 days are not outliers, and payments 31 days instead of 30 days are not outliers either. Maybe the payments on day 38 and 39, or I think there were two on day 38, maybe you could characterize those as outliers, but payments made two days early and one day late, if we could characterize them that way, hardly seem like outliers. Well, there's two different components here, Your Honor. One is determining the baseline. And when he cut off from April 15th and after, actually if you look at Exhibit 5 that was stipulated to by the parties, it shows that all of the payments after April 15th are quite significant after 30 days. There's a 40% increase in the lateness of those payments. So it's not the slight deviation that Your Honor is suggesting. The other part of this is that in taking the averages and then he made a 16 to 28-day boundary basically, is that you have to have some reasonable, ascertainable boundaries to continuously say, well, 31 is just next to 30, 32 is just next. Where do you draw the line? Where do you allow some payments in and some are not? There has to be reasonable, ascertainable boundaries, and they're not going to be applicable to every case. This is a factual determination based on the creditor and the debtor. And in this case, he allowed that window. He gave Jason a safe harbor by establishing that baseline of 16 to 28 and reducing, quite reducing, their significant potential preference liability. If there are no further questions, Your Honor, I'd ask that the Court affirm the Bankruptcy Court and the District Court. Thank you. In rebuttal, Your Honors, I have just two or three points in response to counsel. The Exhibit 5 that was just referred to that shows the whole pre-preference period, if you actually look on page 6 where the April 15th date is used, there's about a 45-day period where, yes, some of the payments went up to 41 days, 47, 49, but then if you actually look at pages 6, 7, and 8, they actually drop down back into the 20s and 30s again. So it's not even a situation where all the payments became really late after April 15th. That same issue is reflected in the committee's exhibit on page 11 where we can see that the payments that were excluded, there are at least 32 of them by my count, that fall right within the same range that we're talking about before. The Hanson case that was referred to, I think, has been mischaracterized by the committee. The Hanson case, as used by the committee, suggested that the bankruptcy court used a 10 percent deviation and Judge Weedoff used a 27 percent deviation in this case. In the Hanson lumber case, actually, the judge looked back three months, saw that the latest payment was 74 days, and decided that that would be the benchmark, if you will, and then the judge in Hanson lumber added 10 percent to that. He didn't add 10 percent in the middle, as has been suggested, so I think that's significant here. The third point in rebuttal is, Jason's really isn't arguing fairness. Jason's is arguing that what happened between Jason's and Spahr is consistent with the policy, and Jason's should be protected by the safe harbor. Jason's continued to extend credit, whether or not we know that Spahr was heading into financial distress or whatever the word is. We don't actually know that. The leap of faith here is that because payments in the middle of the pre-preference periods became 10, 15 days late, that all of a sudden Jason's is headed into bankruptcy. The reality is that the payments sort of returned to normal and it was six or eight months before Jason's ended up in bankruptcy. Unless the court has any questions, I have no further. We'd ask the court to reverse the two courts below and find that these payments are protected by the subjective ordinary course of business defense and or new value if needed. Thank you. All right, thank you. Thanks to all counsel. Thank you.